# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

SANJIV KAUL, et al.,

          Plaintiffs,

    v.

MENTOR GRAPHICS CORPORATION,

        Defendant.

Case No.  16-cv-02496-BLF

**ORDER GRANTING MOTION TO DISMISS**

[Re:  ECF 23]

Plaintiffs brought this action as minority shareholders of Calypto Design Systems, Inc. ("Calypto"), alleging that Defendant Mentor Graphics Corporation ("Mentor") breached its fiduciary duty as the majority shareholder.  In moving to dismiss this action, Defendant argues that controlling Delaware law bars Plaintiffs from challenging a transaction from which they had already accepted consideration for their shares.  Defendant further contends that Plaintiffs have failed to allege a cognizable claim for damages.  For the reasons stated below, the Court GRANTS Defendant's motion to dismiss.

## I.    BACKGROUND

Prior to being acquired by Mentor, Calypto was a Delaware corporation with a principal place of business in San Jose, California.  Compl. ¶ 2-3.  Calypto's software products helped engineers design circuits and also provided synergies with offerings from other major chip design companies, such as Mentor, Synopsys, Inc., and Cadence Design Systems, Inc.  *Id.*  On or about August 30, 2011, Calypto shareholders entered into a Stockholders Agreement ("SA") with Mentor, giving Mentor the right to designate two seats on a four-person board in exchange for Mentor's asset contribution to Calypto.  *Id.* ¶ 13, 16, Ex. A.  From then on, Mentor effectively assumed the role of a majority shareholder of Calypto.  *Id.*  The SA also defined the parties' rights to buy and sell shares as set forth in the "Put and Call Options" provision of the agreement.  Under the "Put Option" part of the provision in the SA, non-Mentor stockholders had the right to require

United States District Court
Northern District of California

United States District Court
Northern District of California

Mentor to purchase all their shares at a specified price during the "Put-Call Period," beginning on the second anniversary of Mentor's asset contribution.  The "Call Option" part of the provision gave Mentor the right to purchase all the shares owned by Non-Mentor stockholders at a specified price during the same "Pull-Call Period." *Id.* ¶ 13, Ex. A.  The provision provides formulas to determine the share price depending on when an option is exercised. *Id.*  Briefly, if Mentor exercises its Call Option on or before August 31, 2015, which is the fourth year anniversary of the Mentor's asset contribution, the formula uses a 1.4 multiplier to set the share price. *Id.*  However, if the Call Option is exercised after August 31, 2015, the multiplier can be less than 1.4 depending on Calypto's cumulative annual growth rate from the second to the fourth anniversary of Mentor's asset contribution ("CAGR"). *Id.*  If the CAGR is over 20%, the multiplier remains at 1.4. *Id.*  However, if the CAGR is between 0% and 20%, the multiplier decreases to 1.  If the CAGR is less than 0%, the multiplier would be 0.75. *Id.*  Accordingly, if Calypto's CAGR is less than 20%, Mentor would be incentivized to exercise its option after August 31, 2015 and not before. *Id.*  The SA separately contains a Stock Purchase Agreement as Exhibit B ("Exhibit B" or "SPA") that the parties would use to exercise their options.

Plaintiffs further allege that after Mentor acquired a majority interest in Calypto on or around August 30, 2011, Mentor provided only minimum financing for Calypto but did not support the company's growth. *Id.* ¶ 16.  In addition, Mentor did not allow Calypto's management to raise money by offering discounts for prompt payments. *Id.*  Mentor also hired away for itself Calypto's strongest sales person. *Id.*

On April 29, 2015, the chief executive officer of Synopsys expressed an interest on behalf of Synopsys to acquire Calypto. *Id.* ¶ 19.  At the time, the Calypto board consisted of Mr. Sanjiv Kaul, who is one of the named Plaintiffs and also Calypto's then chief executive officer; Mr. George Pavlov; and two Mentor-designated members – Mr. Brian Derrick and Mr. John Lenyo. *Id.* ¶ 3, 15.  After discussing the potential acquisition with Synopsys's chief executive officer, Mr. Kaul related the issue to Mr. Pavlov. *Id.* ¶ 20.  Mr. Pavlov then emailed Mr. Joe Rhinehart, the Vice President, Corporate Development and Investor Relations at Mentor, to obtain Mentor's consent to pursue a potential acquisition by Synopsys.  Mr. Rhinehart initially consented.

United States District Court
Northern District of California

However, Calypto's outside counsel then told Mr. Pavlov about the risk of disclosing confidential information in the course of due diligence and that Mr. Rhinehart should be alerted to that risk. *Id.* After Mr. Rhinehart was informed of the risk, he neither granted nor refused to consent to further discussions with Synopsys. *Id.*

Mr. Kaul later contacted Mr. Greg Hinckley, Mentor's president, about the potential acquisition by Synopsis. Mr. Hinckley replied, "Mentor's intention is to exercise the call in August or September. As I understand the 2011 Asset Contribution Agreement, Calypto has three ways to significantly change its share ownership: going public, the put, and the call. Calypto cannot and should not be looking for potential buyers since Mentor has both the contractual right and the intention to buy Calypto as stated in the 2011 agreement." *Id.* ¶ 21.

According to Plaintiffs, at the time Mr. Kaul and Mr. Hinckley conversed, Calypto's share price was $0.16 per share, based on the formula set forth in the SA. Mentor knew that Calypto would not achieve CAGR of over 0% because of several reasons, including the amount of revenue in the first few months of year four, the departure of Calypto's best salesman, and the lack of equity and debt financing. *Id.* ¶ 23. As such, Plaintiffs allege that rather than allow Calypto and the minority shareholders to seek to maximize their share value through a sale to Synopsys, or exercise its call price at $63 million, Mentor waited four months until the call price declined by 50% before exercising its Call Option to acquire Calypto. *Id.* ¶ 24.

At the board meeting on May 15, 2015, Calypto's outside counsel advised on the contractual provision regarding potential sales to third parties, the directors' obligations, and the risks of providing confidential information during due diligence. *Id.* ¶ 26. After the meeting, Mr. Derrick and Mr. Wetzel, the two Mentor-designated directors, decided to discuss with Mentor the potential sale to Synopsis. *Id.* ¶ 26. Plaintiffs allege that Mentor instructed its designated Calypto board members not to grant authority to Calypto's management to negotiate such a sale. *Id.* ¶ 27. At the next board meeting on May 20, 2015, Mr. Derrick and Mr. Wetzel did not vote on a motion to continue discussion with Synopsys but insisted on independent counsel for advice. *Id.* ¶ 28. The Calypto management team gave a presentation at the following board meeting on May 27, 2015 and recommended that the company pursue discussions with third parties other than Mentor.

*Id.* ¶ 29. The board discussed at the meeting whether Calypto's outside counsel was sufficiently independent because they also represented Mentor and Tallwood, another Calypto shareholder, in other matters. *Id.*

On June 13, 2015, the Mentor-designated directors proposed a resolution to obtain independent counsel. *Id.* ¶ 31. Mr. Kaul opposed the motion because he found that the advice of Calypto's then outside counsel sufficient. *Id.* ¶ 31. Mr. Pavlov then moved for authorization to pursue sale of the company to third parties other than Mentor. The Mentor-designated directors abstained from the vote, and the motion thus failed to pass without a majority. *Id.* ¶ 31.

On August 31, 2015, Mentor exercised its option to acquire the remaining shares of the company that it did not own, at about $0.079 per share, an amount less than half of the amount had it exercised its option on April 29, 2015, when Mr. Kaul and Mr. Pavlov first raised the possibility of Synopsis' acquisition to the board. *Id.* ¶ 34.

On these factual allegations, Plaintiffs assert a single claim for breach of fiduciary duty. *Id.* ¶¶ 35-39.

## II. LEGAL STANDARD

### A. Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When considering a motion to dismiss, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). The Court "need not, however, accept as true allegations that contradict matters properly subject to judicial notice or by exhibit." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

### B. Leave to Amend

Under Rule 15(a), a court should grant leave to amend "when justice so requires," because "the purpose of Rule 15 . . . [is] to facilitate decision on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc). A court may deny

1    leave to amend for several reasons, including "undue delay, bad faith, . . . [and] futility of

2    amendment." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

3    **III.    DISCUSSION**

4        **A.    Choice of Law**

5          The parties dispute whether Delaware law or California law governs Plaintiffs' breach of

6    fiduciary duty claim.  Plaintiffs argue that California law should govern this action because the

7    Stock Purchase Agreement ("SPA"), Exhibit B to the 2011 Stockholders Agreement ("SA"),

8    specifies California law as the parties' choice of law.  Opp. 6-7.  Defendant, however, contends

9    that Delaware law, as specified in the choice-of-law provision in the SA, should govern.  Reply 1-

10   2.

11         Federal courts sitting in diversity look to the law of the forum state when making choice of

12   law determinations.  *Hoffman v. Citibank (S. Dakota), N.A.*, 546 F.3d 1078, 1082 (9th Cir. 2008)

13   (citing *Fields v. Legacy Health Sys.*, 413 F.3d 943, 950 (9th Cir.2005)).  "California has two

14   different analyses for selecting which law should be applied in an action."  *Wash. Mut. Bank, FA*

15   *v. Superior Court*, 24 Cal. 4th 906, 914 (2001).  Where there is no advance agreement between the

16   parties regarding applicable law, courts apply the three-step governmental interest test,

17   "analyz[ing] the governmental interests of the various jurisdictions involved to select the

18   appropriate law."  *Id.*  Where, as here, the parties have entered into an agreement containing a

19   choice-of-law provision, California state courts would apply the parties' choice of law articulated

20   in their agreement unless the analytical approach in Section 187(2) of the Restatement (Second) of

21   Conflict of Laws ("§ 187(2)") dictates a different result.  *Hoffman*, 546 F.3d at 1082; *Nedlloyd*

22   *Lines B.V. v. Superior Court*, 3 Cal. 4th 459, 468 (1992).

23       **i.    The Stockholders Agreement vs. the Stock Purchase Agreement**

24         A threshold matter here is which of the two agreements should govern – the SA,

25   containing a choice of Delaware law, or the SPA, setting forth a choice of California law.

26   Defendant argues that SA should govern this dispute because it "defines the rights and obligations

27   for the exercise of Defendant's Call option," the acquisition price, and other issues that are at the

28   heart of this dispute.  Reply 1.  Plaintiffs contend that SPA should govern because the SPA

United States District Court
Northern District of California

governs the exercise of the Put/Call option.  Opp. 6.  Plaintiffs also highlight a provision of the SPA stating that the SPA "supercede[s] all prior understandings and agreements . . . with respect to the specific subject matter hereof" to argue that SPA takes precedence over SA.  *Id.*; Comp. Ex. 1, § 6.4 (SPA).

Instructive to determination of this issue is the holding in *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459, 468 (1992).  Although the *Nedlloyd* court was not confronted with different choice-of-law provisions in two agreements, it remains pertinent here.  The court in *Nedlloyd* had to determine whether the scope of the choice-of-law provision in an agreement encompassed the plaintiff's breach of fiduciary duty cause of action.  *Id.* at 468.  In concluding that the choice-of-law clause governed the claim for breach of fiduciary duty, the court found that the parties' "shareholders' agreement [] expressly provides for the purchase of shares in [plaintiff] by [defendant] and creates the relationship between shareholder and corporation that gives rise to [plaintiff]'s cause of action. [Defendant]'s fiduciary duties, if any, arise from – and can exist only because of – the shareholders' agreement pursuant to which [plaintiff]'s stock was purchased by [defendant]." *Id.*

Based on the same principle announced in *Nedlloyd*, Plaintiffs' breach of fiduciary duty claim derives from Defendant's relationship and fiduciary duty to Calypto, which arose from the acquisition of Calypto shares and voting power on the Calypto board.  Accordingly, the agreement relating to Defendant's fiduciary relationship with Calypto, *i.e.*, acquisition of its shares and voting power on its board, should be the agreement that governs this dispute.  Other courts in both Delaware and California, are in agreement with the principle that fiduciary duty arises from the result of being a majority shareholder.  *E.g.*, *Bohler-Uddeholm Am., Inc. v. Ellwood Grp.*, Inc., 247 F.3d 79, 101 (3d Cir. 2001) (citing *Weisbecker v. Hosiery Patents, Inc.*, 51 A.2d 811, 813–14 (Pa. 1947)) (fiduciary duty to a minority shareholder arises as a result of being a majority shareholder); *Jones v. H. F. Ahmanson & Co.*, 1 Cal. 3d 93, 110 (1969) ("when a number of stockholders combine to constitute themselves a majority in order to control the corporation as they see fit, they become for all practical purposes the corporation itself, and assume the trust relation occupied by the corporation towards its stockholders."); *Cleveland v. Johnson*, 209 Cal.

App. 4th 1315, 1338 (2012) ("[b]efore a person can be charged with a fiduciary obligation, he must either knowingly undertake to act on behalf and for the benefit of another, or must enter into a relationship which imposes that undertaking as a matter of law"); *Zimmerman v. Crothall*, 62 A.3d 676, 699 (Del. Ch. 2013) (noting that the breach of fiduciary duty claim "arises from the common law duty that would attach to a shareholder 'exercis[ing] control over the business affairs of the corporation'").

A detailed review of the two agreements reveals that the SA, but not the SPA, is pertinent to Defendant's fiduciary relationship to Calypto.  In the recitals of the SA, the parties specified that Defendant and other Calypto stockholders entered into an "Asset Contribution and Reorganization Agreement . . . pursuant to which Mentor will contribute certain assets to the Company [Calypto] in exchange for share of Company [Calypto]'s Common Stock."  Compl. Ex. 1, Recitals (SA).  The Recitals also state that "[a] condition to the obligations of the parties to the Reorganization Agreement is the entry by the parties hereto into [the SA] for the purpose of setting forth the terms and conditions pursuant to which the [non-Mentor stockholders] shall vote their shares of [Calypto]'s voting stock in favor of certain designees to [Calypto]'s Board of Directors."  *Id.*  The SA next requires the Calypto stockholders to "vote or act with respect to all of their Shares so as to elect two (2) members of the [Calypto]'s Board of Directors designated by Mentor."  *Id.* § 1(a)(ii) (SA).  The other two members of the Calypto's board would consist of the chief executive officer, and another member elected by the non-Mentor stockholders.  *Id.* §§ 1(a)(i)-(ii) (SA).  The next few sections of the SA relate to the "Put/Call Option," such as the relevant Put/Call period, the formulas to calculate share price, and other obligations of the parties. *Id.* § 2 (SA).  The SA only mentions the SPA twice, also named the "Exhibit B, Definitive Agreement," once in the paragraph introducing the "Put Option" and another in the paragraph introducing the "Call Option."  *Id.* § 2(a), (b) (SA).  Briefly, these paragraphs state that should either Mentor or non-Mentor stockholders exercise their option, the party should purchase the shares pursuant to the SPA.  *Id.*

In contrast to the SA, the SPA contains no provisions governing share voting or board election.  The SPA mostly relates to the purchase of the shares, such as deliveries of the stock

United States District Court
Northern District of California

United States District Court
Northern District of California

1  certificates, and representations and warranties of the purchasers and sellers.  *Id.* §§ 2-4 (SPA).

2  Aside from a reference to the SA in the introduction, the SPA provides little to no information on

3  the relationship between Mentor and non-Mentor stockholders.

4       Because the SA governs voting of shares and election of board members, effectively

5  turning half of the Calypto board over to Defendant, Defendant's relationship with Calypto and its

6  fiduciary duty arose from the SA.  Accordingly, *Nedlloyd* and the weight of authority dictate that

7  the SA should govern the alleged breach of Defendant's fiduciary duty.

8       Plaintiffs argue that the SPA should govern instead because Defendant breached its

9  fiduciary duty by executing the SPA.  Hr'g Tr. 4:1-8; Resp. to Surreply 1.  Specifically, Plaintiffs

10  allege Defendant did not complete its breach until it purchased the remaining Calypto shares and

11  the SPA is the agreement Defendant executed for purchasing those shares.  Hr'g Tr. 4:12-18.

12  However, the Court finds no authority, and Plaintiffs provide none, that when a party breaches a

13  duty that arose from a first agreement by executing a second agreement, the second agreement is

14  more related to the breach of duty claim than the first agreement.  Plaintiffs' own allegations in the

15  complaint further belie this conclusion.  The complaint relates Defendant's designation of two

16  members to the Calypto board in exchange for its asset contribution, the Put/Call Option, the

17  formulas to calculate share price, and Defendant's exercise of the Call Option, all of which are

18  related to provisions detailed in the SA, but not in the SPA.  *E.g.*, Compl. ¶¶ 13-16, 21-24, 31-34,

19  37; *see also* Compl. Ex. D (Notice of Exercise of Call Option).  In light of Plaintiffs' allegations

20  that rely almost entirely on the SPA and the fact that Defendant's fiduciary duty arose from the

21  SPA, the Court finds that SPA's choice-of-law provision governs this action.

22          **ii.**    **Choice of Law Provision in the Stockholders Agreement**

23       Plaintiffs further argue that California law should govern because selecting Delaware law

24  would violate a fundamental policy of the State of California, citing *Nedlloyd*.  3 Cal. 4th at 465;

25  Opp. 8.  However, Plaintiffs overlook the choice-of-law provision in the SA, stating that "This

26  Agreement and all acts and transactions pursuant hereto and the rights and obligations of the

27  parties hereto shall be governed, construed and interpreted in accordance with the laws of the State

28  of Delaware, without giving effect to principles of conflicts of law."  Compl. Ex. A ¶ 14 (SA).

1    Since the parties agreed that Delaware law should govern "without giving effect to

2    principles of conflicts of law," analysis with respect to whether the fundamental policy of

3    California is violated is not applicable and Delaware law controls.  When two sophisticated parties

4    negotiated a choice-of-law provision, such as the case here, the Court will give effect to the mutual

5    intention of the parties.  *Nedlloyd*, 3 Cal. 4th at 468 ("When two sophisticated, commercial entities

6    agree to a choice-of-law clause like the one in this case, the most reasonable interpretation of their

7    actions is that they intended for the clause to apply to all causes of action arising from or related to

8    their contract").

9        iii.    **Fundamental Policy of California**

10   Even if the Court were to proceed with the choice-of-law analysis, the Court is not

11   persuaded that parties' choice of Delaware law should be set aside.  Plaintiffs contend that

12   Delaware law is contrary to the fundamental policy of California, in that California proscribes

13   "[m]ajority shareholders [from using] their power to control corporate activities to benefit

14   themselves alone or in a manner detrimental to the minority."  *Ahmanson*, 1 Cal. 3d at 108; Opp.

15   8.  Plaintiffs also assert that California law imposes an equitable limitation to the power of

16   majority shareholder, citing to several cases.  Opp. 8.

17   As an initial matter, Plaintiffs fail to account for California's "strong policy considerations

18   favoring the enforcement of freely negotiated choice-of-law clauses," as argued by Defendant.

19   Reply 2-3 (citing *Nedlloyd*, 3 Cal. 4th at 462).  In *Nedlloyd*, the defendant companies bought

20   shares of the plaintiff company and agreed to ensure the success of the business.  *Id.*  They entered

21   into a contract, titled "Shareholders' Agreement" that contained a Hong Kong choice-of-law

22   provision.  *Id.*  Later, the plaintiff brought a cause of action for breach of fiduciary duty, alleging

23   that the defendants engaged in activities that led to the cancellation of charter hires that were

24   essential to its business and reneged on commitments to contribute additional capital, among

25   others.  *Id.* at 463.  Confronted with the plaintiff's argument that California law should apply

26   instead of Hong Kong law, the *Nedlloyd* court stated "[w]hen two sophisticated, commercial

27   entities agree to a choice-of-law clause like the one in this case, the most reasonable interpretation

28   of their actions is that they intended for the clause to apply to all causes of action arising from or

United States District Court
Northern District of California

9

1    related to their contract." *Id.* at 468.  In finding that Hong Kong law applied to the plaintiff's

2    breach of fiduciary duty claim, the California Supreme Court further added that California has a

3    policy of respecting the choices made by parties to voluntarily negotiated agreements.  *Id.* at 471.

4    Similar to the defendants in *Nedlloyd*, Defendant here entered into the SA with Plaintiffs

5    when it first acquired stock and voting rights to become a Calypto shareholder.  Just like the

6    agreement in *Nedlloyd*, the parties' SA also specified a choice-of-law provision.  Also like the

7    plaintiff in *Nedlloyd*, Plaintiffs here argue that California law should apply to its breach of

8    fiduciary duty claim.  Since California Supreme Court found California has a strong policy

9    favoring enforcement of such provisions and enforced the choice-of-law provision in *Nedlloyd*, the

10   parties' choice of law in the SA should also be enforced here.  Nevertheless, given that the

11   *Nedlloyd* court did not address any other fundamental policies of California other than the policy

12   of enforcing choice-of-law provisions, and Plaintiffs here have argued that there exist relevant

13   California policies contradicted by Delaware law, the Court will consider Plaintiffs' arguments

14   below using the section 187(2) approach.

15   As mentioned above, California courts adopt the following analytical approach in section

16   187(2) of the Restatement (Second) of Conflict of Laws ("§ 187(2)") for their choice-of-law

17   analysis.

18               The law of the state chosen by the parties to govern their contractual
            rights and duties will be applied, even if the particular issue is one which

19          the parties could not have resolved by an explicit provision in their
            agreement directed to that issue, unless either

20               (a) the chosen state has no substantial relationship to the parties or the
            transaction and there is no other reasonable basis for the parties' choice, or

21               (b) application of the law of the chosen state would be contrary to a
            fundamental policy of a state which has a materially greater interest than

22          the chosen state in the determination of the particular issue and which,
            under the rule of § 188, would be the state of the applicable law in the

23          absence of an effective choice of law by the parties.

24   § 187(2).

25   The Court has determined above that the SA is related to the relationship between

26   Defendant and Calypto, a Delaware corporation, so there is a reasonable basis for the parties'

27   choice of Delaware law.  Although some shareholders reside in California, Defendant and other

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1    investor plaintiffs are not California residents.  Opp. 7; Compl. ¶¶ 7-9.  The relationship to the

2    parties alone thus would not be a sufficient ground to override the parties' choice of law and the

3    law of Calypto's state of incorporation.  The remaining issue is whether application of Delaware

4    law would be contrary to the fundamental policy of California.  § 187(2)(b).

5         The general proposition that majority shareholders owe a fiduciary duty to minority

6    shareholders, as advanced by Plaintiffs, also exists in Delaware law.  *E.g.*, *Malone v. Brincat*, 722

7    A.2d 5, 11 (Del. 1998) (holding that a majority stockholder "owed a fiduciary duty . . . which

8    required 'complete candor' in disclosing fully 'all the facts and circumstances surrounding the'

9    tender offer.").  As such, Delaware law does not make majority shareholders' rights absolute and

10   thus is not contrary to California's fundamental policy at least in this respect.  Rather, based on the

11   papers and Plaintiffs' representation at the hearing, Hr'g Tr. 8:5-14, the pertinent issue here is

12   whether a majority shareholder like Defendant, can exercise its Call Option, a right previously

13   negotiated by minority Calypto shareholders with Defendant in exchange for asset contribution,

14   and whether Defendant's fiduciary duty to Calypto abrogates that right.  Mot. 6-10; Opp. 14-16;

15   Reply 6-11.  Another related issue is whether minority shareholders have a right to damages if

16   they have accepted the benefits of the transaction.  Mot. 6-10; Opp. 14-16; Reply 11-12.  The

17   Court reviews each of the California cases cited by Plaintiffs below to determine whether

18   Delaware law is contrary to California's fundamental policies on these points.

19        In *Jones v. H. F. Ahmanson & Co.*, a case relied upon by Plaintiffs, the stock of a savings

20   and loan company was initially not readily marketable because of its high book value, lack of

21   investor information and facilities, and the closely held nature of the company.  1 Cal. 3d 93, 113

22   (1969).  In light of the great interest in savings and loan stock at the time, the defendants could

23   issue a split to create a market for the company stock, or to create a holding company and permit

24   all stockholders to exchange their shares before going public.  *Id.*  Either approach would have

25   benefited all shareholders equally.  *Id.*  However, in realizing the possibility of losing their

26   majority control, the defendants opted to create a holding company but excluded the minority

27   shareholders from participating in the exchange.  *Id.*  The shares held by minority shareholders

28   remained unmarketable while the value and dividends of the holding company stock soared.  *Id.*

United States District Court
Northern District of California

1    The court then held in *Ahmanson* that the majority shareholders must facilitate public trading and

2    even if no market exists, they must not use their power to benefit themselves to the detriment of

3    the minority.  *Id.* at 115.  Comparing to the facts of this case, *Ahmanson* does not involve a pre-

4    existing contract that defines the rights of the majority shareholders like the SA in this case.

5    *Ahmanson* also does not speak to whether a fiduciary duty would nullify a Call Option previously

6    negotiated by two sophisticated parties.  Moreover, the plaintiff in *Ahmanson* did not accept the

7    benefits of the transaction so the right to sue for damages was not barred.  *Id.* at 105.

8         Similarly, *Thrasher v. Thrasher* is not on point and thus cannot espouse a California policy

9    that contradicts Delaware law with respect to the issues relevant to the present case.  27 Cal. App.

10   3d 23 (Ct. App. 1972).  Plaintiffs in the present case rely on *Thrasher* for the proposition that "the

11   established requirement of scrupulous fairness permits inquiry into the motives and purpose of the

12   dominant shareholder in his enforcement of repayment otherwise properly recoverable by him."

13   Opp. 8 (citing *Thrasher*, 27 Cal. App. 3d at 27).  In *Thrasher*, a husband and wife co-owned a

14   corporation, to which the husband lent money drawn from a bank account jointly owned by the

15   couple but without the wife's permission.  *Id.* at 27.  Further, the husband testified that he made

16   the loan from the joint account because he "didn't want [his wife] to have any of it."  *Id.*  Shortly

17   after the couple's acerbic divorce, the husband removed the wife from the board and purportedly

18   excluded her from board meetings.  *Id.* at 27-28.  The husband further forced the corporation to

19   repay all the debts so as to destroy the corporation.  *Id.* at 26, 28.  The court in *Thrasher* sustained

20   the lower court's finding that the husband planned the destruction of the corporation and the

21   enforced debt collection was a means to such end.  *Id.*  As such, the husband's fiduciary duty to

22   the corporation prevented him from enforcing the debt payment, given that his motive was to

23   destroy the corporation.  Here, in contrast, there are no alleged facts suggesting that Defendant's

24   motive in exercising its call option was a means to destroy Calypto and Plaintiffs did not argue

25   that in their papers or at the hearing.  Instead, Plaintiffs simply argued to the Court that

26   Defendant's rights in the SA must be read out based solely on Defendant's fiduciary duty to

27   Calypto.  Hr'g Tr. 8:5-14.  *Thrasher* speaks neither to this point nor to the issue of whether

28   Plaintiffs have a right to damages when they have accepted the benefits of the transaction.

United States District Court
Northern District of California

1    Lastly, Plaintiffs cite *In re Security Finance Company*, for the proposition that the statutory

2    power to dissolve a corporation "is subject to equitable limitations."  49 Cal. 2d 370, 377 (1957).

3    In that case, Rouda and the Crocker brothers failed to agree on how Rouda could extricate himself

4    from his corporate duties while protecting his return on investment.  *Id.* at 375.  Given that the

5    Crockers rejected his many other proposals to exit the company, Rouda filed for dissolution.  *Id.* at

6    375-78.  The California Supreme Court first noted that the controlling issue was whether the

7    decision to dissolve the corporation was made in good faith, and ultimately found that the

8    evidence supported that Rouda acted in good faith, given that all other alternatives were foreclosed

9    to him.  *Id.* at 377-78.  Based on its holdings and the facts, *In re Security Finance Company* has

10   limited application to the present case.  First, the case here does not concern a statutory right to

11   dissolve a corporation.  Second, Plaintiffs here do not claim bad faith.  Lastly, like the other

12   California cases relied upon by Plaintiffs, *In re Security Finance Company* does not address the

13   issue of whether a shareholder's fiduciary duty abrogates a contractual right or whether Plaintiffs

14   have a right to damages after they have accepted the benefits of the transaction.

15   Finally, the Court notes that California law does not contradict Delaware law barring a

16   minority shareholder plaintiff's right to damages after he or she has accepted the benefits of the

17   transaction.  *Compare Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840, 848 (Del. 1987) *with*

18   *Steinberg v. Amplica, Inc.*, 42 Cal. 3d 1198, 1211-14 (1986).  In both *Bershad* and *Steinberg*, the

19   courts found that an informed shareholder who has accepted the benefits of a merger cannot sue

20   for damages.  *Bershad*, 535 A.2d at 848; *Steinberg*, 42 Cal. 3d at 1214.

21   In sum, the California cases cited by Plaintiffs do not address the pertinent issues in this

22   case.  At best, these cases confirm generally that a majority shareholder's power to conduct its

23   affairs can be limited, but this is also a policy supported by Delaware case law.  Moreover,

24   California law as set forth in *Steinberg* is consistent with Delaware law as set forth in *Bershad*.

25   Given the strong California policy in enforcing parties' choice-of-law provision and Plaintiffs'

26   failure to identify how Delaware law violates California's fundamental policies on the relevant

27   issues in this case, the Court finds that selection of Delaware law would not violate the

28   fundamental policies of California based on the Restatement § 187(2) analysis and is the

governing law in this case.

### iv.   Internal Affairs Doctrine

In an attempt to avoid application of Delaware law, Plaintiffs also argue that the "internal affairs doctrine" does not apply because the present case qualifies for the exception that California has a more significant relationship to the parties and to the corporation than Delaware.  Opp. 10.  Defendant counters that even if the choice-of-law provision in the SA does not control, the internal affairs doctrine would dictate that Delaware law applies because Calypto was a Delaware corporation.  Reply 3-4.

The internal affairs doctrine is set forth in Restatement (Second) Conflict of Laws section 306 as the following.  "[T]he obligations owed by a majority shareholder to the corporation and to the minority shareholders will be determined by the local law of the state of incorporation, except in the unusual case where, with respect to the particular issue, some other state has a more significant relationship . . . to the parties and to the corporation, in which event the local law of the other state will be applied."  Restatement (Second) of Conflict of Laws § 306 (1971).  In finding that the choice-of-law provision applied to the plaintiff's breach of fiduciary duty claim, the California Supreme Court in *Nedlloyd* also noted that it would reach the same conclusion based on the internal affairs doctrine.  *Nedlloyd*, 3 Cal. 4th at 471.  Specifically, it stated that "even in the absence of a choice-of-law clause, Hong Kong's overriding interest in the internal affairs of corporations domiciled there would in most cases require application of its law."  *Id.*  Thus, the internal affairs doctrine only comes into play when there is no choice-of-law clause.

Here, the Court has found that parties' Delaware choice-of-law provision applies to Plaintiffs' fiduciary duty claim so there is no need to analyze the internal affairs doctrine.  Even if the Court were to entertain the internal affairs doctrine, Plaintiffs have provided no authority to counter the *Nedlloyd* court's finding that the fiduciary duty claim should be governed by the law of state of incorporation.  The only Californian authority Plaintiffs offer is *Havlicek v. Coast-to-Coast Analytical Servs., Inc.*, 39 Cal. App. 4th 1844, 1854 (1995).  Opp. 10-11.  However, the case is inapposite to the facts of the present case because the parties there did not have a choice of law provision, and the issue did not involve a breach of fiduciary duty claim but a director's right

United States District Court
Northern District of California

1    to inspect books and records of a company.  *Havlicek*, 39 Cal. App. 4th at 1854.  In fact, many

2    other courts have applied the law of the state of incorporation in cases concerning breach of

3    fiduciary duty claims.  *E.g.*, *Voss v. Sutardja*, No. 14-01581-LHK, 2015 WL 349444, at *9 (N.D.

4    Cal. Jan. 26, 2015) (in a case concerning breach of fiduciary duty claim and others, applying

5    Bermuda law and rejecting the plaintiff's argument that an exception to internal affairs doctrine

6    should apply simply because of the company's extensive contacts with California); *Booth v.*

7    *Strategic Realty Trust, Inc.*, No. 13-04921-JST, 2014 WL 3749759, at *8 (N.D. Cal. July 29,

8    2014) (applying Maryland law to a breach of fiduciary duty claim based on the internal affairs

9    doctrine); *Copeland v. Lane*, No. 11-01058-EJD, 2012 WL 4845636, at *4 (N.D. Cal. Oct. 10,

10   2012) (applying Delaware law in a case concerning breach of fiduciary duty claim and others

11   based on the internal affairs doctrine); *In re Sagent Tech., Inc., Derivative Litig.*, 278 F. Supp. 2d

12   1079, 1087 (N.D. Cal. 2003) (stating that "courts in California follow [the internal affairs

13   doctrine] and apply the law of the state of incorporation in considering claims relating to internal

14   corporate affairs").

15           Accordingly, *Nedlloyd*, as well as the weight of authority in this district, directs this Court

16   to find that internal affairs doctrine would also compel an application of Delaware law.

17       **B.   Adequacy of Plaintiffs' Claim Under Delaware Law**

18           Having decided that Delaware law should apply to Plaintiffs' breach of fiduciary duty

19   claim, the Court now turns to the parties' arguments based on Delaware law.

20               **i.   Whether Plaintiffs' Claim is Barred After the Benefits of the Transaction
                        Have Been Accepted**

21

22           Defendant argues that Plaintiffs cannot challenge the fairness of the completed merger

23   given that Plaintiffs were informed minority shareholders who accepted the benefits of the

24   transaction.  Mot. 7 (citing *Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840, 848 (Del. 1987).

25   Plaintiffs admit that they received from Defendant a total of $0.0789 per share for their Calypto

26   stock.  Mot. 7 (citing Compl. ¶ 38).  Plaintiffs were also the ones who gave Defendant the right to

27   acquire the remaining shares of Calypto "in its sole and absolute discretion at any time" and knew

28   that Defendant intended to buy Calypto.  Mot. 8 (citing Compl. ¶¶ 13, 21, 25).  In opposing the

United States District Court
Northern District of California

1   motion, Plaintiffs do not dispute that they were informed minority shareholders.  Opp. 15-16.

2   Instead, Plaintiffs argue that the Delaware Supreme Court overruled *Bershad* in *Khan v. Lynch*

3   *Communications Systems, Inc.*, 638 A.2d 1110 (Del. 1994) or that the application of *Bershad* has

4   been limited by Delaware's lower courts.  Opp. 15.  Plaintiffs also claim that the facts of the

5   present case are distinguished from those of *Bershad* because they did not vote on a merger

6   transaction after receiving a proxy statement.  *Id.* at 16.  Rather, Plaintiffs were forced to

7   relinquish their shares due to a contractual obligation so did not acquiesce to the merger.  *Id.*

8        "When interpreting state law, federal courts are bound by decisions of the state's highest

9   court.  In the absence of such a decision, a federal court must predict how the highest state court

10   would decide the issue using intermediate appellate court decisions, decisions from other

11   jurisdictions, statutes, treatises, and restatements as guidance.  However, where there is no

12   convincing evidence that the state supreme court would decide differently, a federal court is

13   obligated to follow the decisions of the state's intermediate appellate courts."  *Vestar Dev. II, LLC*

14   *v. Gen. Dynamics Corp.*, 249 F.3d 958, 960 (9th Cir. 2001) (citing *Lewis v. Tel. Employees Credit*

15   *Union*, 87 F.3d 1537, 1545 (9th Cir.1996)).

16        In *Bershad*, the board of a majority-shareholder defendant approved a merger with its

17   subsidiary.  535 A.2d at 842-43.  The plaintiff initially voted against the merger, but he later

18   tendered his shares and accepted consideration for the merger.  *Id.* at 843.  Nevertheless, the

19   plaintiff later asserted a claim for breach of fiduciary duty, arguing that he had not been properly

20   informed about the defendant's strict policy against selling the subsidiary to third-parties.  *Id.* at

21   844.  The court first noted that "[s]tockholders in Delaware corporations have a right to control

22   and vote their shares in their own interest,  . . . limited only by any fiduciary duty owed to other

23   stockholders."  *Id.* at 845.  The court also stated that "a stockholder is under no duty to sell its

24   holdings in a corporation, even if it is a majority shareholder, merely because the sale would profit

25   the minority."  *Id.*  Then the court found that that the majority-shareholder defendant had no duty

26   to disclose its policy rejecting third party offers given that the subsidiary was not for sale and that

27   no offer was ever made.  *Id.* at 847.   In affirming the lower court's summary judgment, the court

28   noted that inclusion of the policy would not have significantly changed "the total mix of

16

United States District Court
Northern District of California

information available to the minority shareholders." *Id.*

After determining that the shareholder vote was an informed vote, the court also affirmed the dismissal of any shareholders who voted in favor of the merger or accepted its benefits. *Id.* at 848. Specifically, the court held that "when an informed minority shareholder either votes in favor of the merger, or like Bershad, accepts the benefits of the transaction, he or she cannot thereafter attack its fairness." *Id.*

Plaintiffs counter that *Bershad* is no longer good law, citing *Khan*. Opp. 15. *Kahn* is another Delaware Supreme Court case that concerns a breach of fiduciary duty claim brought against a controlling shareholder. 638 A.2d at 1111. In *Kahn*, Alcatel, the majority shareholder of Lynch, wanted to acquire a subsidiary of its parent instead of another company that the Lynch management identified as more appropriate. *Id.* at 1112, 1115. Lynch's independent committee found that the company Alcatel wanted to acquire was overvalued and recommended a rejection of Alcatel's proposal. *Id.* at 1113. In response, Alcatel proposed to buy all of the remaining shares of Lynch for $14 per share but later raised it to $15.50 per share. *Id.* The independent committee found all of Alcatel's proposed share prices inadequate. Alcatel then advised the board that it was ready to "proceed with an unfriendly tender at a lower price" if the independent committee rejected the $15.50 price. *Id.* Thereafter, the independent committee voted to approve the merger. *Id.*

The *Kahn* court was mainly concerned with the steps of burden shifting when establishing entire fairness at trial and whether the independent committee was truly independent. *Id.* at 1117-20. The court in *Kahn* first determined that the "standard of judicial review in examining the propriety of an interested cash-out merger transaction by a controlling or dominating shareholder is entire fairness." *Id.* at 1117 (citing *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710-11 (Del. 1983)). In the context of applying the entire fairness standard, the *Kahn* court also noted that "no court could be certain whether the transaction terms fully approximate what truly independent parties would have achieved in an arm's length negotiation." *Id.* at 1116. Plaintiffs rely on this proposition in opposing Defendant's motion and to argue that *Kahn* overruled *Bershad*. Opp. 15. However, *Kahn* does not mention *Bershad* in its opinion, let alone overrule it. Moreover, if

United States District Court
Northern District of California

Plaintiffs' proffered proposition from *Kahn* is accepted without consideration to its facts, any challenge by a minority shareholder to the fairness of the price is immune to a motion to dismiss regardless of the facts of the case, which is not what *Kahn* stands for.  *See* 638 A.2d at 1116 (citing *Weinberger*, 457 A.2d at 703) (holding that "where corporate action has been approved by an informed vote . . .  the burden entirely shifts to the plaintiff to show that the transaction was unfair to the minority).  Rather, *Kahn* was evaluating the steps of burden shifting in establishing entire fairness at trial and whether an independent committee was truly independent, issues not relevant here.  638 A.2d at 1120-21.  Plaintiffs' claim in the present action does not concern an independent committee as in *Kahn*.  *Kahn* also has limited application to this case because its facts do not relate to whether a controlling shareholder's fiduciary duty limits its right in a previously-negotiated contract with a minority shareholder, which both parties agreed at the hearing is a key issue in this case.  Hr'g Tr. 8:5-14.

Plaintiffs also cite the following decisions by Delaware's lower courts as limiting or overruling *Bershad*.  *In re JCC Holding Co.*, 843 A.2d 713, 722–24 (Del. Ch. 2003) (noting that *Lynch* undermined *Bershad* and holding that "a stockholder who casts a vote in favor of, or later accepts the consideration from, a merger effected by a controlling stockholder is not barred by the doctrine of acquiescence, or any other related equitable doctrine such as waiver, from challenging the fairness of the merger."); *In re Best Lock Corp. Shareholder Litig.*, 845 A.2d 1057, 1079 (Del. Ch. 2001) (observing that "[t]he result in *Bershad* would . . . have been different . . . if there had not been a ratifying vote of the minority shareholders"); *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1143 n.89 (Del. Ch. 2006) (identifying an "apparent inconsistency" and noting "[w]hether it is because minority stockholders who are squeezed out in an unfair transaction cannot, by definition, be well informed, or because, as this court has held, *Kahn v. Lynch* implicitly overruled the holding in *Bershad*, it seems extremely unlikely to the court that Delaware law denies a remedy to minority stockholders battered into accepting unfair merger consideration").

Whether the holding in *Bershad* continues to be popular among Delaware's lower courts is not relevant here.  This Court finds persuasive the Fourth Circuit's consideration of the continuing vitality of *Bershad*.  In *Schwartz v. Blum*, the court was confronted with the same cases relied

upon by Plaintiffs to avoid the application of holding in *Bershad*. 309 F. App'x 718 (4th Cir. 2009). The plaintiff in *Schwartz* brought a breach of fiduciary duty claim against his former business partners stemming from the sale of their company. *Id.* at 718-19. As here, the plaintiff also contended that various Delaware Chancery decisions have limited *Bershad*. *Id.* at 721. The *Schwartz* court acknowledged the tension between *Bershad* and certain opinions of Delaware Chancery courts. However, since the Delaware Supreme Court had not fashioned an exception to *Bershad*, the court concluded that *Bershad* remains the controlling law. *Id.*

The Court agrees with the Fourth Circuit in *Schwartz*. Because the Delaware Supreme Court has not overruled *Bershad* and certain Delaware's lower courts have continued to apply it, this Court will follow *Bershad*. *E.g.*, *Norberg v. Sec. Storage Co. of Wash.*, No. 12885, 2000 WL 1375868, at *1, 7 (Del. Ch. Sept. 19, 2000) (citing *Bershad* in holding that an informed minority shareholder cannot challenge the fairness of the transaction in a cash-out merger). Only in the absence of a state supreme court opinion can this Court engaged in a prediction of how the highest state court would decide the issue using intermediate appellate court decisions. *Vestar*, 249 F.3d at 960. Here, the Delaware Supreme Court has not limited or overruled *Bershad* so it is still the controlling law.

Under *Bershad*, Plaintiffs' claim of breach of fiduciary duty is barred. Plaintiffs do not dispute that they were informed shareholders, and neither can they, given that they were parties to the SA setting forth the full details of the Put/Call Options. Compl. ¶¶ 13, 21, 25. Since they accepted the benefits of the transaction, they cannot now attack its fairness. *Id.* ¶ 38; *Bershad*, 535 A.2d at 848. Plaintiffs attempt to distinguish this case from *Bershad*, in that the present case concerns the use of a call option and *Bershad* is limited to shareholder votes on a merger after a disclosure through a proxy statement. Opp. 16; Resp. to Surreply 2. The Court finds no reason why *Bershad* would not apply when a majority shareholder uses a call option to acquire a company and Plaintiffs provide no authority supporting their argument. This case is analogous to *Bershad* in that both concern an allegation of breach of fiduciary duty against a majority shareholder after consideration has been accepted. Like the outcome in *Bershad*, Plaintiffs' claims are not viable under the facts alleged.

### ii.   Mentor's Exercise of Its Call Option Under the Stockholders' Agreement

Independent of whether Plaintiffs' claim would be barred under *Bershad*, Defendant further argues that *Nemec v. Shrader* is dispositive on the point of whether Defendant's fiduciary duty limits Defendant's right to exercise its Call Option pursuant to the SA.  991 A.2d 1120, 1128 (Del. 2010); Reply 9.  Based on *Nemec*, Defendant contends that its exercise of the option did not violate its fiduciary duty.  Reply 9-11.  Plaintiffs counter that despite the SA provision allowing Defendant to exercise its Call Option at any time, Defendant as a fiduciary must either pursue a third-party sale or exercise its option at the same time as when any potential third-party sale arose.  Opp. 4.  Further, Plaintiffs argue that *Nemec* is not applicable, and *Rabkin v. Philip A. Hunt Chem. Corp.* should govern instead.  498 A.2d 1099, 1106 (Del. 1985); Hr'g Tr. 8:11-25; Resp. to Surreply 1-2.  The Court will evaluate *Nemec* and *Rabkin* in turn below.

The *Nemec* plaintiffs were retired officers of the company Booz Allen, and under their Stock Plan, each had a "put" right, exercisable for a period of two years from the date of retirement, to sell his or her shares back to the company at book value.  991 A.2d at 1123.  After that two-year period expired, Booz Allen then had the right to redeem, at any time, part or all of the retired officer's stock at book value.  *Id.*  About a year after the plaintiffs retired, the company discussed a possible sale to a third-party that could potentially boost the share price to over $700 per share.  *Id.* at 1124.  At the time, it seemed likely that the sale transaction would close by the two-year mark of the plaintiffs' retirement.  *Id.*  However, the transaction took longer than expected and did not actually close until four months after the plaintiffs' put rights had expired.  *Id.*  Since plaintiffs did not exercise their put right within the two-year period, the Booz Allen directors redeemed plaintiffs' stock after their put rights expired and before the sale to the third party.  *Id.* at 1124-25.  Accordingly, when the sale occurred, the additional shares from plaintiffs added approximately $60 million in proceeds to active Booz Allen stockholders.  *Id.* at 1125.

The Delaware Supreme Court affirmed the lower court's dismissal of the complaint, containing allegations of breach of the implied covenant of good faith and fair dealing and breach of fiduciary duty.  *Id.* at 1128-29.  Finding that there was no breach of the implied covenant of good faith, the *Nemec* court assessed the parties' "reasonable expectations at the

20

1  time of contracting" and concluded that based on the Stock Plan, the plaintiffs had no reasonable

2  right to participate in the transaction. *Id.* at 1126. The court further stated that "[a] party does not

3  act in bad faith by relying on contract provisions for which that party bargained where doing so

4  simply limits advantages to another party." *Id.* at 1128.

5      In affirming the lower court's dismissal of the fiduciary duty claim, the *Nemec* court held

6  that "[i]t is a well-settled principle that where a dispute arises from obligations that are expressly

7  addressed by contract, that dispute will be treated as a breach of contract claim." *Id.* at 1129.

8  Further, the court noted that in such context, "any fiduciary claims arising out of the same facts

9  that underlie the contract obligations would be foreclosed as superfluous." *Id.*

10     Plaintiffs contend that the *Nemec* opinion should be limited, citing two cases – *Lee v.*

11  *Pincus*, No. 8458-CB, 2014 WL 6066108 (Del. Ch. Nov. 14, 2014) and *Schuss v. Penfield*

12  *Partners, L.P.*, No. 3132-VCP, 2008 WL 2433842 (Del. Ch. June 13, 2008). Opp. 18. The Court

13  first notes that *Lee* and *Schuss* are not Delaware Supreme Court decisions and thus cannot trump

14  *Nemec* in their own right. Second, these two opinions are consistent with *Nemec* in that when a

15  contract governs the relevant conduct, courts look to the contractual agreement to determine

16  whether there is a breach of fiduciary duty. For example, the *Lee* court found that the board

17  breached its duty because "the challenged action did not involve the exercise of any contractual

18  right governing [plaintiff's] shares but instead involved modifications to the contractual provisions

19  governing their own shares." 2014 WL 6066108, at *9. The court also made it clear that the

20  agreement did not grant the board the discretion to waive or restructure their own lockup

21  restrictions. *Id.* at *9 n.50. As for *Schuss*, Plaintiffs rely on it simply for the proposition that a

22  contract claim can stand independently of a breach of fiduciary duty claim since a breach of

23  fiduciary duty claim can depend on additional facts and is broader in scope, which is not

24  inconsistent with *Nemec*. 2008 WL 2433842, at *10. The facts and other holdings of *Schuss* are

25  otherwise inapposite here. Thus, the Court concludes that *Nemec* is not limited by *Lee* or *Schuss*

26  in regard to the issues presented in this case.

27     The Court now turns to *Rabkin*, a breach of fiduciary duty case decided 25 year prior to

28  *Nemec*, where the Delaware Supreme Court addressed whether plaintiffs had a right to damages

United States District Court
Northern District of California

based on a supposedly unfair acquisition.  In *Rabkin*, Olin Corporation became the majority

shareholder of Hunt Corporation, by purchasing 63% of Hunt's stock at $25 per share pursuant to

a Stock Purchase Agreement.  498 A.2d at 1109-10.  The Stock Purchase Agreement also required

Olin to pay $25 per share if Olin acquired the remaining Hunt stock within one year thereafter.  *Id.*

at 1101.  Based on facts alleged in the complaint, Olin had always anticipated owning 100% of

Hunt but delayed acquisition until just after the one-year mark.  *Id.* at 1102.  Notably, the parties

in *Rabkin* had not negotiated a purchase price after the one-year period expired.  *Id.*  When Olin

finally initiated discussion to acquire the remaining shares, it offered $20 per share.  *Id.* at 1103.

The plaintiffs challenged the proposed merger on the grounds that the offered price was grossly

inadequate because Olin manipulated the timing of the merger to avoid the contractual price of

$25 per share.  *Id.*

The *Rabkin* court concluded that the plaintiffs could maintain their action on the ground

that the plaintiffs sought "to enforce a contractual right to receive $25 per share, which . . . was

unfairly destroyed by Olin's manipulative conduct."  *Id.* at 1105.  Particularly, the court found

persuasive the allegations of fact relating to Olin's intention to acquire Hunt and its purposeful

delay to avoid paying $25 per share, effectively depriving the "minority of the same bargain that

Olin made with Hunt's former majority shareholder."  *Id.* at 1105-07.  The court also found that

the defendants were "charged with bad faith which goes beyond issues of 'mere inadequacy of

price.'"  *Id.* at 1107.

It is notable that both *Rabkin* and *Nemec* relied on the contracts at issue to determine

whether the breach of fiduciary duty claim should proceed.  The *Nemec* court found that the

contract did not provide the retired partners the right to participate in the buy-out so the plaintiffs

had no claims.  991 A.2d at 1128-29.  Similarly, the *Rabkin* court looked to the contract and found

that the majority shareholder purposefully avoided its obligation to pay the agreed-upon $25-per-

share acquisition price.  498 A.2d at 1105-07.

Plaintiffs contend that *Rabkin* is more applicable because the controlling shareholder

benefited at the expense of the minority shareholders, similar to here.  Resp. to Surreply 1.

However, the *Nemec* defendants also benefited from the shares they acquired from the plaintiffs.

United States District Court
Northern District of California

As such, receiving a benefit at the expense of other shareholders is not determinative of whether a breach of fiduciary duty claim survives. Rather, whether parties performed in accordance with their contract is a key factor in both *Rabkin* and *Nemec* in determining whether the plaintiffs' breach of fiduciary duty claim should proceed. *Nemec*, 991 A.2d at 1128; *Rabkin*, 498 A.2d at 1102-03; Surreply 1-2. The defendant in *Rabkin* circumvented paying the per-share price set forth in a previously-negotiated contract. In contrast, Defendant here acquired Calypto based on the formulas and within the Put/Call period expressly agreed upon by Plaintiffs, similar to how the *Nemec* defendants acquired the shares under the retired partners' Stock Plan. Specifically, Plaintiffs gave Defendant the right to acquire the remaining shares of Calypto "in its sole and absolute discretion at any time" within the Put/Call period and also knew that Defendant intended to buy Calypto. Compl. ¶¶ 13, 21, 25. As such, the Court finds *Nemec* more analogous to the present case than *Rabkin*.

Now applying *Nemec* to the present case, the Court finds that Defendant's fiduciary duty does not prevent it from exercising its contractual rights set forth in the SA. As held by the *Nemec* court, "where a dispute arises from obligations that are expressly addressed by contract, that dispute will be treated as a breach of contract claim" and the breach of fiduciary duty claim would be foreclosed. 991 A.2d at 1129. Defendant here exercised its option pursuant to the contractual provisions that it bargained for in the SA. Plaintiffs' breach of fiduciary duty claim also arose from obligations that are expressly addressed by the parties' SA. Even if the provision limits certain advantages to Plaintiffs under some circumstances, the provision was mutually agreed upon by the parties and nobody was deprived of the "bargain" that was previously made. *Id.* at 1128; *Rabkin*, 498 A.2d at 1107. Plaintiffs also had a chance to exercise their own option earlier but did not do so, similar to the retired partner in *Nemec*. More importantly, no authority supports Plaintiffs' theory that Defendant's fiduciary duty is so broad that it would nullify the SA provision governing Put/Call Option, or would obligate it to exercise the option at the same time a potential third-party buyer makes an initial inquiry. The Court thus finds that Defendant's fiduciary duty to Calypto does not abrogate the parties' contractual duties here. *Nemec*, 991 A.2d at 1129.

   **iii.    Failure to Plead Cognizable Damages**

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Defendant argues in the alternative that Plaintiffs' claim fails because they cannot show

2 that Mentor's alleged breach of fiduciary duty proximately caused the alleged damages.  Mot. 10-

3 13.  Specifically, Defendant contends that since Mentor had a right to control and vote their shares

4 in their own interest, Mentor would have voted against a potential sale and no third-party sale

5 would have occurred regardless.  Mot. 10-11 (citing *Thorpe by Castleman v. CERBCO, Inc.*, 676

6 A.2d 436, 444 (Del. 1996) and *Bershad*, 535 A.2d at 845).  Plaintiffs counter that while they do

7 not dispute that Defendant had a contractual right to exercise its call, it nevertheless breached its

8 fiduciary duty when it did.  Opp. 16-17.  Accordingly, Plaintiffs assert that had Defendant

9 exercised its call at the same time the possibility of a potential third-party buyer arose, or allowed

10 Synopsys to purchase Calypto, they would have received at least $0.16 or more per share.  *Id.* at

11 16.  Plaintiffs further contend that because the *Thorpe* court allowed for damages caused by the

12 breach of fiduciary duty, their claim for damages remains proper.  *Id.* at 16-17.

13    *Thorpe* involved majority shareholders keeping secret a corporate opportunity to sell a

14 subsidiary to a third party for their own benefit.  676 A.2d at 444.  Although the court determined

15 that the majority shareholders breached their fiduciary duty, it found that the transactional

16 damages claimed by the plaintiff were not proximately caused by the breach of fiduciary duty.  *Id.*

17 at 445.  This is because under Delaware law, a majority shareholder, regardless of its fiduciary

18 duty, has a right to vote its shares against a potential sale and need not sacrifice its own interest in

19 connection with its vote.  Del. Code title 8, § 271(a) (requiring "shareholder approval of a sale of

20 all or substantially all of a corporation's assets"); *Bershad*, 535 A.2d at 845 (holding that "a

21 stockholder is under no duty to sell its holdings in a corporation, even if it is a majority

22 shareholder, merely because the sale would profit the minority"); *Thorpe*, 676 A.2d at 444.  As

23 such, the court concluded that "[d]amages cannot be awarded on the basis of a transaction that has

24 a zero probability of occurring due to the lawful exercise of statutory rights."  *Id.*  On that basis,

25 the *Thorpe* court determined that there was no causal link between the breach of fiduciary duty

26 and the alleged transactional damages.  *Id.*  Nevertheless, the court awarded incidental damages

27 that the corporation incurred in connection with negotiations which it would not otherwise have

28 incurred had the majority shareholder not attempted to expropriate the sale opportunity.  *Id.* at 445.

1    Here, Plaintiffs seek damages related to the potential acquisition of Calypto that under the

2  holding in *Thorpe* would be precluded for not being proximately caused by the breach of fiduciary

3  duty.  676 A.2d at 445.  As in *Thorpe*, Defendant's power and the right to veto any third-party sale

4  trumps its fiduciary duty to Calypto and Defendant was not obligated to approve any sale.  Even

5  assuming Defendant breached its fiduciary duty, the damages stemming from the acquisition of

6  Calypto would not be proximately caused by its breach but from its statutory right to veto any

7  third-party sale.  Although the *Thorpe* court allowed for recovery of some incidental damages,

8  Plaintiffs here have not alleged any incidental damages and are seeking only transactional

9  damages based on share price differences in connection with the acquisition of Calypto.  Plaintiffs

10  thus have no cognizable damages under *Thorpe*.

11  **C.    Futility of Amendment**

12    The Court considers the following factors in deciding whether to grant leave to amend

13  Plaintiffs' complaint: undue delay, bad faith or dilatory motive on the part of the movant, repeated

14  failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing

15  party by virtue of allowance of the amendment, futility of amendment.  *Eminence Capital, LLC v.*

16  *Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (*quoting Foman v. Davis*, 371 U.S. 178, 182

17  (1962)).

18    The first four factors – undue delay, bad faith or dilatory motive, repeated failure to cure

19  deficiencies by amendments previously allowed, and undue prejudice to the opposing party – are

20  not applicable to the present case because an amendment subsequent to this first motion to dismiss

21  would come at an early procedural stage.  The factor relating to bad faith also does not apply here

22  because the present determination on whether to grant leave does not stem from a motion for leave

23  by Plaintiffs.

24    The Court, however, finds that the last factor – futility of the amendment – to be

25  dispositve.  "[A] proposed amendment is futile only if no set of facts can be proved under the

26  amendment to the pleadings that would constitute a valid and sufficient claim or defense."  *Miller*

27  *v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988).  The Ninth Circuit has alternatively

28  stated that the test of whether amendment would be futile is "identical to the one used when

United States District Court
Northern District of California

25

considering the sufficiency of a pleading challenged under Rule 12(b)(6)." *Id.*; *see Utterkar v. Ebix, Inc.*, No. 14-02250-LHK, 2015 WL 5027986, at *8 (N.D. Cal. Aug. 25, 2015).

Here, Plaintiffs insist that Defendant's fiduciary duty to Calypto compels the Court to read out Defendant's rights in the SA. Hr'g Tr. 8:5-14. However, as discussed above, Delaware law states otherwise. First, Plaintiffs' claim here is barred under *Bershad*. Even setting *Bershad* aside, *Nemec* held that if a contract addresses the conduct constituting the alleged breach of fiduciary duty, the breach of fiduciary duty claim is foreclosed by the contract. Plaintiffs' representation to the Court that their claim must proceed based solely on the existence of a fiduciary duty is contrary to Delaware law and thus the claim fails on this theory. Plaintiffs also state that the complaint alleges no breach of contract. Opp. 17-18. Plaintiffs further concede that Mentor was not contractually required to exercise its call at the time when the third party made an initial inquiry since Mentor had discretion as to when to exercise its call. *Id.* ¶¶ 2, 17-19. Given that Plaintiffs have foreclosed any allegations relating to breach of contract, and have proffered no other facts or alternative legal theories to support this breach of fiduciary duty claim, the Court finds that an amendment would be futile.

## IV.    ORDER

For the foregoing reasons, the Court finds Plaintiffs' claim barred by *Bershad* because they have accepted the benefits of the transaction. Plaintiffs' breach of fiduciary duty claim also cannot stand under Delaware law as set forth in *Nemec* and *Rabkin*, as Defendant's fiduciary duty to Calypto does not abrogate its contractual right to exercise its option. Furthermore, Plaintiffs' damages are not proximately caused by the alleged breach of fiduciary duty as Defendant had a right to vote against any sale under Delaware law. In light of Plaintiffs' admission that Defendant had a right to exercise its Call Option in its sole discretion, and in the absence of other facts or applicable legal theories, the Court finds that amendment would be futile. Accordingly, the Court GRANTS Defendant's motion to dismiss without leave to amend.

Dated: October 26, 2016

_____
BETH LABSON FREEMAN
United States District Judge

United States District Court
Northern District of California